34 F.3d 1080
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
ADVANCED STERILIZATION PRODUCTS, A DIVISION OF JOHNSON &
JOHNSON MEDICAL INC., Plaintiff-Appellant,
v.
ABTOX INC., Defendant-Appellee.
 No. 94-1015.
 United States Court of Appeals, Federal Circuit.
 Aug. 15, 1994.
Rehearing Denied; Suggestion for Rehearing In Banc Declined
Oct. 3, 1994.
 
 Before NEWMAN, LOURIE, and SCHALL, Circuit Judges.
 DECISION
 LOURIE, Circuit Judge.
 
 
 1
 Advanced Sterilization Products ("ASP") appeals from an order of the United States District Court for the District of Northern California granting the motion of Abtox Incorporated for summary judgment of non-infringement of U.S. Patents 4,643,876 and 4,756,882. Advanced Sterilization Prods. v. Abtox Inc., Civ. No. C-92-5050-VRW (N.D.Cal. Aug. 24, 1993). We affirm-in-part, vacate-in-part, and remand.
 
 BACKGROUND
 
 2
 ASP owns the two patents[1] in suit, which are directed to processes for sterilizing articles, particularly medical instruments, whereby the articles to be sterilized are contacted with hydrogen peroxide and then exposed to electromagnetic energy. Under conditions of high vacuum, the electromagnetic energy converts the hydrogen peroxide precursor gas into an ionized gas, or "plasma," which contains the active sterilant. The patented processes are effective in killing microorganisms and offer several advantages over the methods currently used by hospitals to sterilize medical instruments, some of which employ damaging heat or steam, or toxic ethylene oxide.
 
 
 3
 Claim 1 of the '876 patent is illustrative of the claims at issue[2] and reads as follows:
 
 
 4
 A process of plasma sterilization using hydrogen peroxide as a precusor [sic] of the active species in the plasma comprising the steps of:
 
 
 5
 placing an item to be sterilized in a chamber,
 
 
 6
 contacting the item with a hydrogen peroxide vapor for a pretreatment time period which is a sufficient time period to allow the hydrogen peroxide to come in close proximity with the item;
 
 
 7
 generating a hydrogen peroxide plasma around the item, and
 
 
 8
 maintaining the item in said hydrogen peroxide plasma for a time period sufficient to allow an active species generated from the hydrogen peroxide plasma to effect sterilization [emphasis added].
 
 
 9
 Appellant ASP develops, manufactures, and sells a peroxide-plasma sterilization system that employs the sterilization processes described in the patents. ASP sells its sterilization system in Europe and anticipates introduction of the system for hospital use in the United States pending FDA approval. Appellee Abtox presently sells plasma sterilization equipment for industrial use, and also awaits FDA approval to market its equipment for hospital use in the United States.
 
 
 10
 ASP filed suit in the district court seeking, inter alia, a declaration that Abtox's proposed manufacture and sale of plasma sterilizers would constitute infringement of, or inducement to infringe, ASP's patents. Abtox moved for summary judgment of non-infringement. The district court granted Abtox's motion, concluding that Abtox's process did not infringe the patents, either literally or under the doctrine of equivalents. ASP appeals.
 
 DISCUSSION
 
 11
 ASP argues that the district court erred in granting summary judgment because it resolved genuine issues of material fact in construing the claims and in determining that the Abtox system did not infringe the patents, literally or under the doctrine of equivalents. Furthermore, ASP complains that the court abused its discretion in denying discovery of the Abtox system. ASP requests that this court vacate the grant and remand with instructions as to the proper legal framework within which to make its infringement analysis.
 
 
 12
 In determining that the Abtox system did not infringe the patents, the district court first interpreted the claim language "generating a plasma around the item" to require that the sterilization process comprise " 'in-field', sterilization using a single-chambered apparatus, where the item to be sterilized is placed directly within the electromagnetic field which produces the plasma." Having thus interpreted the claims, the court found that the Abtox system did not infringe because it is an " 'out-of-field', two-chamber sterilizer where the electromagnetic field is generated in and confined within a plasma chamber, separate from the sterilization chamber in which the item to be sterilized is placed." Thus, the court determined that unlike the claimed process, in which plasma generation and sterilization occur in the same chamber, the Abtox sterilizer creates the plasma in a first, generation chamber and then "rains" the "active species"[3] of the plasma onto the object to be sterilized, which is located in a second, sterilization chamber.
 
 1. Claim Interpretation
 
 13
 ASP argues that the court's claim construction was erroneous because the court interpreted the claim language "generating a plasma" in a manner contrary to its meaning as commonly understood, as defined by the patentee in the patent specification, and as used by those of ordinary skill in the art. According to ASP, the term "generating" is commonly understood to mean "to bring into existence ...; to originate (something material) by a physical or chemical process," see Advanced Sterilization, slip op. at 4 (citing Webster's Third International Dictionary (1981)), and that the term "plasma" is expressly defined in the patents at issue as "any portion of the gas or vapors ... produced as a result of the applied electrical field" regardless whether an electrical field is present. Thus, according to ASP, a plasma is generated wherever it, or any portion of it, is being created by chemical and/or physical processes. ASP asserts that the claims cover the Abtox system because the system generates plasma not only in its first chamber, where an applied electromagnetic field initially forms the plasma, but also within its second chamber, where species within the initially formed plasma propagate, or continue to collide, react with, and recombine with other species in the gas molecules on and around the items to be sterilized to create new species by chemical and/or physical processes. On the other hand, Abtox argues, and the district court agreed, that the patents' specifications and prosecution histories support the conclusion that the phrase "generating a plasma around the item" requires that the item to be sterilized be located within the electromagnetic field that initially forms the plasma.
 
 
 14
 The specification explains that "[p]lasmas are normally generated by electrical discharges in gases." Further, it states that "plasma is generated at a power level sufficient to achieve sterilization." "Plasma" is described as "any portion of the gas or vapors ... produced as a result of the applied electrical field.... The applied field may cover a broad frequency range, however, a radio frequency is commonly used." Also, "[t]he [radio frequency] energy used to generate the plasma may be continuous or it may be pulsed." This description from the specification indicates that the patentee intended "generating a plasma" to mean the application of external energy to ionize a precursor gas, not the result of internal secondary chemical or physical processes that occur within the plasma after it has been initially formed. The use of the words "any portion of the gas or vapors ... produced as a result of the applied electrical field" to define plasma does not compel a different conclusion in light of the other portions of the specification and the plain language of the claims.
 
 
 15
 ASP argues that the description in the specification alone is not a sufficient basis for limiting the claims. See, e.g., Laitram Corp. v. Cambridge Wire Cloth Co., 863 F.2d 855, 865, 9 USPQ2d 1289, 1299 (Fed.Cir.1988), cert. denied, 490 U.S. 1068 (1989) (references in the specification are not claim limitations). ASP points out that the specification also explicitly references several prior art plasma-sterilization systems and states with respect thereto: "Plasma is generated in the present process in the same manner as in the previously-mentioned prior art plasma sterilization system." Thus, ASP argues that the prior art plasma sterilization systems referred to by the patentee also provide guidance as to the intended meaning of the language "generate a plasma."
 
 
 16
 Notably, some of the prior art patents disclose two-chambered plasma sterilization systems, in which the plasma is initially formed in a first chamber and then allowed to flow into a second chamber. However, all of the cited patents describe the actual "generation" or production of plasma in terms of its formation by exposing a precursor gas to some form of energy.[4] Thus, to those of ordinary skill in the art at the time the patent was filed, the term "generating the plasma" refers to the ionization of a precursor gas by the application of external energy, not to the internal secondary chemical or physical propagation of the plasma once it is generated.
 
 
 17
 Finally, as recognized by the district court, statements in the specification and prosecution history regarding "Example VIII" provide additional insight into the meaning of the phrase "generating a plasma." Example VIII, set forth in the specification, describes an experiment performed by the patentee in order to compare the sporicidal (bacteria killing) activity obtained with hydrogen peroxide and heat to that obtained with hydrogen peroxide and plasma. As described in the specification, "[t]his test was conducted by placing samples inside and outside a wire cage in the plasma chamber [so that the] sample inside the wire cage was shielded from [radio-frequency] radiation and plasma formation but not from exposure to hydrogen peroxide vapor or the heat generated by the plasma [emphasis added]." The patentee noted a reduced sporicidal activity inside the wire cage "largely [ ] due to the absence of plasma formation since similar sporicidal activity was obtained with hydrogen peroxide alone inside and outside the cage, and after plasma treatment the temperatures inside and outside the wire cage were similar [emphasis added]." During the prosecution, the patentee argued that "[t]he presence of the hydrogen peroxide prior to the generation of the plasma does not substantially sterilize the items [emphasis added]." Example VIII was cited in support of the patentee's arguments. The descriptions in the specification and prosecution histories relating to Example VIII thus support the view that the language "generation" or "formation" of plasma was intended to mean that it occur within an applied radio frequency field.
 
 
 18
 We thus reject ASP's strained reading of the term "generating the plasma." Consistent with the patent specification and prosecution histories, and with the usage by those of ordinary skill, as shown in the prior art, we construe the phrase "generating the plasma" to mean ionizing a precursor gas by applying external energy. Thus, the phrase "generate a plasma around the item" requires that the energy necessary to ionize the precursor gas be applied around the item to be sterilized.
 
 2. Literal Infringement
 
 19
 Having construed the claims, the next issue is whether the claims literally read on the Abtox system. Accordingly, we must satisfy ourselves that the court properly determined that there were no genuine issues of material fact. ASP argues that a question of fact exists as to whether or not an electromagnetic field is present in the Abtox sterilization chamber. However, Abtox responds that any such field is hundreds if not thousands of times too weak to generate a plasma. ASP does not dispute this, but contends only that a plasma can be generated in the absence of an electromagnetic field as long as plasma formation is first initiated upstream. In view of the above claim interpretation, which requires that the electromagnetic field generate the plasma around the item, we conclude that no genuine issue of material fact exists as to literal infringement.
 
 
 20
 The salient characteristics of the Abtox system are undisputed. ASP concedes that, in the Abtox sterilizer, plasma formation is initiated in a first, generation chamber that is separate from a second, sterilization chamber and that the plasma, once formed, propagates into the sterilization chamber. In view of our holding that the phrase "generate a plasma around the item" requires that the energy necessary to ionize the precursor gas be applied around the item, and in light of ASP's admission that the Abtox system does not do so, we conclude that the court properly determined on summary judgment that the Abtox system does not literally infringe the claims.
 
 3. Doctrine of Equivalents
 
 21
 ASP also sought to establish that the Abtox system infringed its patents under the doctrine of equivalents, alleging that the "plasma flow[ing] past items to be sterilized in the Abtox system performs the same function (sterilizing) in the same way (oxidizing reactions with spores) to achieve the same result (sterilized items) as the plasma discussed in the Jacobs Patents."
 
 
 22
 ASP argues here that the court erred by resolving genuine issues of material fact as to the significance of the prosecution history, the operation of the Abtox system, and the Abtox system's equivalence to the claimed process. ASP also asserts that the district court abused its discretion in denying ASP the opportunity to examine the accused infringing system, and that such discovery was crucial in order to properly respond to Abtox's summary judgment motion.[5] We agree with ASP on both points.
 
 
 23
 The court's equivalents analysis was perfunctory at best, consisting of one sentence. In granting summary judgment of non-infringement under the doctrine of equivalents, the court simply concluded that "ASP's 'in-field' system is substantially different from Abtox's 'out-of-field' system, and that the plasma in ASP's sterilizer, which contains charged particles and ions, is substantially different from the neutral species that perform the sterilization in the Abtox system." The court provided no indication as to why the "out-of-field" system was substantially different from the "in-field" system, and why it did not constitute merely an immaterial change to perform substantially the same function to achieve substantially the same result in substantially the same way. The court appeared to adopt the view that ASP was precluded as a matter of law from asserting a range of equivalents that would encompass an "out-of-field" or "two-chambered" system, like the Abtox system.[6]
 
 
 24
 Although the court did not thoroughly explain its reasons for its determination of non-equivalence, the court may have assumed that the patentee's statements in the prosecution history with respect to Example VIII amounted to an express disclaimer of an out-of-field system and, hence, that the doctrine of prosecution history estoppel bars ASP from claiming a range of equivalents that would encompass the Abtox system. However, ASP has asserted that the significance of this prosecution argument was only that "the claimed process of [hydrogen peroxide] treatment followed by [hydrogen peroxide] plasma treatment was synergistic," and that the prosecution history does not preclude a finding of infringement under the doctrine of equivalents. Whenever the doctrine of prosecution history estoppel is invoked, "a close examination must be made as to, not only what was surrendered, but also the reason for such a surrender." Loctite Corp. v. Ultraseal Ltd., 781 F.2d 861, 871, 228 USPQ 90, 96 (Fed.Cir.1985). The trial court did not do this. Moreover, despite the court's assumption that Example VIII and the Abtox system were "similar" in some critical way, ASP has presented testimony that the two are critically different. We conclude therefore that there are genuine issues of fact concerning what processes were given up during prosecution and whether Abtox utilizes such a process, which should not have been resolved by the court on summary judgment.
 
 
 25
 Furthermore, on summary judgment, the court was required to view the evidence in a light most favorable to ASP and draw all reasonable inferences in its favor. See A.B. Chance Co. v. RTE Corp., 854 F.2d 1307, 1310-11, 7 USPQ2d 1881, 1884 (Fed.Cir.1988). In analyzing the prosecution history, the court found that the prosecution of the patents at issue was "tortuous." The record indicates, however, that there were only two office actions, after which the invention was "understood to define over [the cited art]." See Joint App. at 76 (examiner interview summary record). Thus, the court did not view this evidence in a light most favorable to ASP. Also, the court found that "the plasma sterilizer art was crowded at the time of the Jacobs patents' prosecution." However, one reasonable inference that could have been drawn is that, despite a large number of prior art sterilizers, the claimed combination of hydrogen peroxide gas and plasma was an important improvement over the prior art.[7] This inference was not drawn in ASP's favor. Abtox used both hydrogen peroxide and plasma, yet the court did not analyze why, in light of this similarity, the differences between the claimed invention and the Abtox process resulted in a finding of non-equivalence. Thus, in granting summary judgment, the court impermissibly resolved genuine issues of material fact and failed to view the evidence in a light most favorable to ASP. Fed.R.Civ.P. 56(c); A.B. Chance, 854 F.2d at 1310-11, 7 USPQ2d at 1884.
 
 
 26
 We conclude that the grant of summary judgment of non-infringement under the doctrine of equivalents was inappropriate. Further analysis and fact-finding are necessary in order to determine whether the Abtox system is equivalent to the claimed invention. Thus, we vacate the district court's grant of summary judgment on the issue of non-infringement under the doctrine of equivalents and remand for a determination of this issue. Moreover, while discovery of the accused system may not have been necessary to decide the questions of claim interpretation and literal infringement involved in the present appeal, we believe that examination of an accused device and how it operates is so basic to determination of a patent infringement claim under the doctrine of equivalents that discovery of the Abtox system should have been allowed.
 
 
 27
 This court has pending an appeal heard in banc for the purpose of considering the legal requirements of a doctrine of equivalents analysis. Hilton-Davis Chemical Co. v. Warner-Jenkinson Co., Inc., Appeal No. 93-1088 (argued Mar. 9, 1994). Until that decision is rendered, further consideration of infringement under the doctrine of equivalents by the district court may be premature. Nonetheless, because informing the parties of the status of the appeal heretofore would seem to be in their interest, we have decided to render our decision without awaiting the results of the Hilton-Davis appeal. Necessary discovery, or even settlement, might proceed in the meantime. The trial court, on remand, might decide to await and take guidance from the legal principles articulated by the in banc court when that opinion is issued.
 
 COSTS
 
 28
 Each party shall bear its own costs.
 
 
 29
 PAULINE NEWMAN, Circuit Judge, concurring in the result.
 
 
 30
 Although I agree that the case must be remanded for proceedings under the doctrine of equivalents, I do not agree that there were no material facts in dispute in connection with the construction of the claims and the finding that there was not literal infringement. Thus I do not believe that the correct standards for review of this summary judgment have been followed in the majority decision. However, I concur in the result because I believe that even on a scientifically reasonable acceptance of the patentee's argument, literal infringement can not be found.
 
 
 
 [1]
 The '882 patent is a continuation-in-part of the '876 patent and it contains the entirety of the '876 specification plus additional examples. Hereinafter, we will refer to the common disclosure of these patents as the "specification," in the singular
 
 
 [2]
 The '882 patent has two independent claims, one directed to a process of peroxide-plasma sterilization and the other directed to a process of removing residual hydrogen peroxide from items that have been sterilized
 
 
 [3]
 The court defined "active species" to be "the part of the plasma which actually accomplishes the sterilization of the item in the Abtox process and consists of uncharged atoms, neutral free radicals and excited molecules."
 4 U.S. Patent 3,383,163 states: "The plasma can be generated and turned off at will merely by turning the power supply on and off." Col. 3, 11. 29-31. U.S. Patent 3,851,436 states: "[G]as may be excited to form gas plasma by utilizing known techniques such as by subjecting it to a radio-frequency field ...," col. 3, 1. 51--Col. 4, 1. 1, as does U.S. Patent 3,948,601, col. 4, 11. 43-45. U.S. Patent 4,207,286 describes: "[Plasma] can be produced through the action of either very high temperatures or strong electric or magnetic fields." Col. 4, 11. 53-55. U.S. Patent 4,321,232 states "a plasma is an essentially neutral cloud of ions and/or free radicals in which atoms or molecules are ionized, dissociated, or excited by an applied field, often a radio frequency (RF) field." Co. 2, 11. 19-24. U.S. Patent 4,348,357 states: "Electrical discharges in gases are the customary means of producing plasmas...." Col. 3, 11. 9-10.
 
 
 [5]
 The district court action was assigned to the Northern District of California Case Management Pilot Program. Pursuant to General Order No. 34 of that program, a moratorium on discovery was initially imposed that precluded the taking of any formal discovery except by stipulation of the parties or on written order of the district court. Under the Order, the parties did disclose certain information to each other, including an identification of persons "known to have discoverable information about factual matters relevant to the case." ASP contends that the motion for summary judgment was filed while the discovery moratorium was in effect and before either party had undertaken discovery. Abtox responds that it "expressed a willingness to have its machine tested by ASP, [but that] ASP sought to delay the date of the tests." From the record, it is unclear why examination of the accused system did not occur before summary judgment was entered against ASP
 
 
 [6]
 The court, in its literal infringement analysis, noted that
 [s]ince the wire cage is permeable to vapors and gas, ... the byproducts of the plasma generated outside the wire cage freely traversed the wire cage and contacted the item inside the case. These downstream byproducts that permeated the cage (and which are similar in nature to the downstream byproducts of the Abtox sterilizer system), were specifically deemed by the inventors not to comprise the "plasma" of the Jacobs patents and not to have been generated around the item.
 Advanced Sterilization, slip op. at 6.
 
 
 [7]
 The examiner acknowledged that "[t]he primary difference between the claims at issue and the prior art is the combined use of hydrogen peroxide vapor in a gas plasma sterilization process."